All right, next case we're going to hear this morning is United States v. Breeland. And Mr. Warren, we'll hear from you first. Good morning, Your Honors, and may it please the Court. My name is John Warren, and I am appointed counsel for Appellant Bernard Breeland. This case arises out of a two-day jury trial on a one-count indictment charging being a felon in possession of ammunition. We've raised four issues in the brief. I'm going to focus my argument on the second and third, which relate to authenticity and lay opinion. Evidence, before I get into that, I did want to flag for the Court I filed a Rule 28J letter late last night in shepherdizing some of the cases cited in the fourth issue, which was the sentencing issue. There were two cases primarily, both out-of-circuit cases. One was United States v. Jordan, which talks about the Ninth Circuit's application of the clear and convincing evidence standard in sentencing enhancements and cross-references. Subsequent to the filing of this brief, the Ninth Circuit has changed that law and overruled that. And additionally, United States v. Brooks, which is a Tenth Circuit case that was cited for the same issue, different sub-issue related to the application of the attempted murder cross-reference, that was subsequently remanded to the District Court. The appellant was resentenced using the same cross-reference, and the Tenth Circuit just affirmed that. Both subsequent authorities are, frankly, quite harmful to the fourth issue, but I wanted to make sure to notify the Court about that. Turning first to the lay opinion evidence, here during trial, the District Court allowed two lay witnesses, both law enforcement officers, to testify about the identification of the individual on the surveillance video. This is a shooting at an apartment complex. There's a large gathering outside, and the shooting is captured on surveillance footage, which we submitted in the joint appendix. The video footage of the shooting itself is not very high quality. The government's case essentially rested on linking that video footage, which shows someone shooting in a distinctive jacket, with other still images from different surveillance footage in the apartment complex. The first, and I think the analysis on these two witnesses is a little bit different. The first was Investigator McIntyre. He is actually a law enforcement officer on the gang task force, and his involvement in the case arises out of, after the shooting, the government sends out a picture from the Investigator McIntyre identifies my client as the individual on the video footage, and the government sought to introduce that identification at trial. Did not witness the shooting, had no personal knowledge of the shooting. That one, you know, you don't need to spend too much time on that one. It seems to me that's straightforward. He recognized that person, Breland, from an earlier thing, said so. You could cross-examine him, but I just find it very difficult, your challenge on that one. I would spend more time, your time more on the second one if you want to focus on this. This is just my own personal view. Yes, and I certainly agree that the argument as to Investigator Fortner, the case agent, is much stronger. So let me jump to that. The government introduced evidence from the case agent. So this is the person from, this is a local investigated case from the City of Columbia Police Department. And Investigator Fortner's first experience with my client, did not know him from his law enforcement job, had no interactions with him. First time he sees him is when he is brought to the City of Columbia Police Department after the shooting. At trial, the government elicited testimony from Investigator Fortner, asking him if he made an identification based off of seeing my client at the police department. And what Investigator Fortner testified to was that he reviewed the surveillance footage after the fact and compared that to his observation of Mr. Breland. And he testified that he determined 100% that it was the same person, Mr. Breland. We have argued that is just quintessentially improper lay opinion testimony. But why? Like, what, like, help me understand, I have a little hard time understanding this argument too. I agree it, maybe it's better than McIntyre. But why is that improper? I mean, is it because he's the case agent?  Because if, imagine instead we had a jail guard who spent, you know, six months supervising your client and so knew him well as a result and then sort of, they showed the supervisor the video and he's like, listen, I've been with this guy for six months, I know, like that's the guy. That would plainly be appropriate, right? There's no requirement that your knowledge of or experience with the defendant here, the person being identified, has to have occurred before the event in question, right? I think that's correct. I have not seen any cases that have said any of that. It just logically has to be true, right? So, is it the fact, I have a little hard time understanding what it is about Fortner, is like actually a problem to you? Is it that he didn't have sufficient time to observe your client? Like, that seems to go to the weight of the evidence, not its admissibility? I guess I'm just a little, I understand you say it's classically prohibited, but what I don't understand is why? What we've argued in the brief and argued in the district court is that essentially the identification in this circumstance, and I'll grant you that there are circumstances with jail bars, people that have some experience, exposure, even after an incident that certainly would be debatable. I mean, a defense lawyer is going to argue that.  So, this, I think this falls in the camp of lay opinion testimony that is sometimes offered by the government, where the law enforcement officer, or any witness, I don't think the fact that he is a law enforcement officer is necessarily the divining fact. What the cases say, though, is where a law enforcement officer relies on information gathered in an investigation, and then offers a lay opinion based upon, or about someone's involvement for the crime. So, that's totally true when it's not an identification, right? So, I get those cases, right, where, you know, people use lay opinion to sort of smuggle in like gang expert testimony. I totally get those cases. I did this enough to sort of recognize those. I've never seen those applied in the context of identification. And in fact, like almost always, the case agent just stands up and is like, do you know Joe Smith? And yes, who is it? It's the defendant that's sitting right by counsel. I mean, that happens in most every case that we see, and that's because, like, they are identifying the defendant as being the defendant. And so, that seems like that happens all the time. I've never really heard the argument that that's impermissible lay testimony. And I'm struggling a little bit to understand, in the context of an identification, why that's a problem. So, I agree that the example that you just gave happens in virtually every trial with both witnesses and law enforcement. Identify the defendant sitting at. What we have here, and this is why I think that the fact that he's a law enforcement officer makes it far worse. What we have here is an identification of a person in a photograph from a surveillance video about which Investigator Fortner has no independent knowledge, no personal knowledge that doesn't arise from just his observations of the video, which is the same thing in the  But he has personal knowledge of who's standing before him in the police station. He certainly is told that that is a client's name. He has no personal. So, imagine I change the facts a little bit, and your client comes into the police station that day looking like he looks in the video, and by the time we get to trial, your client has shaved his head and lost 50 pounds, right? I don't know anything about your client, but imagine that scenario happens, right? We would, of course, say that the officer could testify. I know he looks like a little skinny ball guy now, but back in the day, he had an afro and he was, like, overweight, and that's him in the video, right? So, the big guy with the afro is the guy. We plainly would allow that. I agree. And I think that... So, why wouldn't that also be true when we've got a low-quality video, right? So, a low-quality video, to me, sort of feels a little bit like the same story, right? That, like, your guy comes in, you probably had him in a sweater vest and glasses, right? He wasn't in a sweater vest and glasses before. This is, like, exactly the type of helpful testimony that we should, like, absolutely permit. And if I can cabin my prior answer, because I want to be very precise about this. I think that the permissible testimony from an officer would be that my client came to the police department and looked in this manner. These are the characteristics he had. I think that testimony is perfectly proper. But couldn't identify him in the video. Couldn't be like, listen, I saw him before he lost 50 pounds and shaved his head, right? I saw him. And so, I had interactions with him. Personal interactions. In person. And so, I know who he looks like. And I know his mannerisms and the way he walks and those things. And I looked at the video, and that's the same person. You think he can't do that when he shows up 50 pounds lighter with a shaved head? I think that is a far closer case and would be a worse case for the defendant. And I think that falls in line with some of the... Why is that different at all? Because it's just testimony. What prompts the testimony, you're saying, it's unnecessary in your case, but it was necessary where the defendant lost 50 pounds and wears glasses. In other words, it's not a necessity question. It's a question of whether it's legitimate. So I think why it becomes permissible lay opinion testimony in that example is the opinion identifying someone derives from the officer's personal knowledge observing the victim on that day. Yeah, but this is a little backwards. He observes him in the police station. And the person in the police station is the defendant in the case. And so, he's basically saying, I saw the person in the police station at that time, and it's the same person I see in the video. Correct. And I think that where that also fails in the 701 analysis is that at the end of the day, what that would permit, and this is a little bit of a slippery slope argument, I realize, but, and of course, it's going to be subject to 403 and other limitations that district courts would, no doubt. But it would permit the government or, frankly, a defendant to just put witnesses up and bolster their arguments through the 701 pathway. Can I ask one question before you sit down? Sure. So, this NIBIN report, can you help me understand what you were introducing it for? What was the purpose for its introduction during the government's case-in-chief or in your case-in-chief? Sure. So, what the NIBIN report showed is that it showed that there was a presumptive match. They ran the shell casings from this shooting through the city of Columbia.  No. I know what a NIBIN report is. What I'm trying to figure is, in the context of this case, what was the purpose for introducing this sort of presumptive and, you know, the presumptive match we all know is like not very useful. They tell you you can't use it. It's not evidence. All those sorts of things. But even put that aside, like what were you, what was the purpose for it? Sure. And I see I'm out of time. I'd like to briefly respond. Please. I'm sure Judge Nima already answered. I'll elaborate on rebuttal. I think the primary purpose of it is to call into question the thoroughness of the investigation.  That's what I thought. And that makes total sense. I understand that argument. I was just trying to figure out if there was some other thing that we were doing. There's not. I mean, there is kind of a part two to that answer, which is more of a contingent part two. And I think it'll help to contextualize this. If there's some argument in trial about alternative perpetrator, third party guilt, that was raised to the district judge. I raised that to the district judge prior to trial because we didn't know how this was going to play out. This all came, this evidence was disclosed right before trial, subpoena came in right before trial. So the direct answer to your question is to call into doubt the thoroughness of the investigation. The part two is going into trial potentially to link the Lexington County documents through that and potentially explore. Well, we know that trial, I just want to say it's irrelevant for this trial because the charge was just ammunition. Ammunition was found at the scene. The gun was found 10 months later. And the course of the gun's travel from any point in time over 10 months in this kind of market is, you don't know where it went and how it went. But it seemed to me you gained almost nothing by it unless you could place the guy 10 months later at the scene or establish that he owned it at that time. And none of that was proffered or suggested. So I have two responses on the two different themes for trial. I think it's very relevant for the thoroughness of the investigation. That's always at issue in any case. I do agree that there would have to be some foundation laid, some links. There would have to be a nexus between the potential alternative perpetrator and this crime. And certainly there's a 10 month gap. Judge Anderson indicated he was inclined to allow this evidence. But it certainly would have been a discretionary call had we gone there. I do ultimately think that issues like the length of time would ultimately go to the weight of the evidence. But I do think that for the issue of the thoroughness of the investigation, I think it's squarely relevant. Thank you. Ms. Hoffman? Excuse me. I'm short. Good morning, Your Honor. Andrea Hoffman on behalf of the United States. Going directly to the Lake testimony issue. With respect to Officer Fortner, it is, I think, critical that he witness this defendant the day after. Frankly, merely hours after this incident happened. And when the discussions came up in the pretrial context of whether the still photograph from the CVP videos would be allowed. I'll tell you my question on this second one. And I understand the discussion we just had. But it seems to me that one of the issues is whether the defendant was the person shown in the video. And the person, and in this case, the officer was looking at the defendant and say, that's the person in the video. The question I would have is, why isn't that for the jury? And why does the person have any superior position to make that judgment call and suggest to the jury that they have to listen to him? That cycles back, Your Honor, to what I was about to explain to you or remind the court about is, when the court was allowing, the district court was allowing the still photograph to come in from the CVP videos, it did so because the defendant's appearance has changed. He had a very distinctive hairdo in the videos that he no longer has. And the still photographs show that distinctive hairdo that Officer Fortner personally observed. So one of the characteristics that can change from the day of trial. So your suggestion is appropriate in this circumstance to fit the circumstances about which we discussed earlier here. I am, Your Honor, because the trial of this case happened three and a half or so years. Judge Richardson's hypothetical about where the man lost 50 pounds. I am, Your Honor. It wasn't all those factors, but it was that analogy. That hypothetical is directly on point from the discussion of whether still photographs would come in. And they limited it. This fits in the sort of rule because it has to be helpful to the jury. Exactly. Right? We don't let lay testimony if it's not helpful to the jury. So the trial judge makes a decision based on looking at the defendant and the video and everything, is it helpful to the jury or not? And that's the sort of discretionary decision that we're really reviewing at its core. Exactly, Your Honor. And this court weighed this issue, had a lengthy hearing about which pieces of still photographs and held things out because it felt some of them would be prejudicial. So it made a reasoned and balanced judgment call that in the context of this case, given the changes, that it would be appropriate. And it is, as I, Judge Richardson said better than I did in my brief, it's classic identification testimony, Your Honors. Well, didn't the jury see this video? The jury saw both videos, Your Honor. There's actually two videos. I mean, that's pretty damning evidence, isn't it? They got to look at it. It is, Your Honor. And particularly when you're watching somebody shoot somebody nine times, even after they fall into the ground. It was a pretty strong set of video. The identity issue specifically is being contested by this defendant. And so the opportunity to amplify that the changes in the person that's present versus the person who's in the video was useful to the government's burden of proof. Well, on another matter, does the withdrawal of evidence at trial mean that the issue is not preserved? It depends on the context of the issue, Your Honor. In this case. Yes. And I hope my 28J letter made clear my less than clear presentation in the brief. The government's arguing that the defendant has waived, with respect to authentication, I'm assuming we're moving to the authentication issue, that the defendant has waived any of the 9025 arguments for authentication. Because the only place that that argument was raised was through the order of proof. And that order of proof was withdrawn before the court could rule on it. So before these, and the Lexington, excuse me, the Lexington County documents specifically, exempting the Nibin report for a moment, I hope that's how we say it. But exempting the Nibin report for a moment, the Lexington County documents were never presented to a witness, were never questioned to a witness. So those documents only had any play in the trial through the order of proof. And the defendant withdrew it. To the extent that the defendant has preserved arguments with respect to the Nibin report, which he absolutely has, he hasn't preserved them as to 9025. Because that, too, was an argument made only in the order of proof and withdrawn before the court could rule. Now, as for the 9014 unique and distinct characteristics, that's absolutely preserved, Your Honor. So that's what I mean by, yes, it can be depending on the circumstances. I don't know what happened, but did the defendant put up any evidence when he had an opportunity to? And if he didn't, did he get the last argument? The defendant put in no evidence, Your Honor. And the government contemplated the question of whether we should waive, because we have to remember that this whole authentication issue is in the context of a new trial motion, not just a challenge to an evidentiary ruling, but in the context of a new trial motion. Well, but my point is, if he didn't offer any evidence, and it's been a long time since I practiced criminal law in South Carolina, but I understand if he doesn't, the defendant gets the last argument. Is that still true? Only in state court, I think, is what your answer is. In federal court, that doesn't work. The government retains the last argument, whether they put on a case or not. I said it's been a long time. Thank you, Your Honor. I'm not licensed in South Carolina for all that. I'm a federal prosecutor there, and I apologize. I said it's been a long time, so I'm not going to. I was about to play out. It is true in state court. At least it used to be. John will be able to tell us for sure. But it used to be the case that if you did not put on a case, then you got the last argument. Got it. In state court, but that has not been the rule in federal court. I got you. The government did get the last argument, Your Honor, in terms of the closing argument. Well, I was thinking of it in terms of making that withdrawal argument stronger, if that had been the case. I apologize. I didn't know that context at all. So to that extent, Your Honor, focusing solely on the 901 aspect of the presentation, that's typically unique and distinctive characteristics. Well, that's typically a particular hairdo, a particular item in a photograph, the shape of a vase, something that would make that item memorable at a later point, which is therefore giving credibility to the reliability of the item being what the offeror says it is. He is relying solely on a case number, which the district court judge found not to be a distinctive characteristic. Not surprisingly, it's a string of numbers. Every single case has them. Every document in every case has them. The simple typing of those numbers onto a document does not in and of itself make that document unique. It wouldn't be, it could be any other string of numbers. It could be added easily by someone fabricating it. I'm not suggesting by any means that defense counsel was fabricating an exhibit. I'm using it for the bigger context of why it wouldn't be a sufficiently unique or distinctive characteristic, as Judge Anderson found it wasn't. There's nothing about this document that particularly would be unique, and the court was persuaded of that. The court held extensive argument on this. So help me understand why, maybe this guy doesn't get there, but you got a ATF agent or Officer Schmidt who is familiar with the NIBIN system, right? This is a common tool that law enforcement uses. He's never seen this one in particular, but if he's familiar with the nature of the reports, and he can look at it and say, hey, listen, this is what it appears to be. I've seen these reports before. This one looks like it's related to this case. Why isn't that enough for authentication, right? It might fail lots of different ways, given the nature of the NIBIN information, but why isn't that enough for authentication? Because, Your Honor, the police reports inherently are something that's never been held to be a self-authenticating document. If the government were to say, I've never seen this document,  right, but I'm familiar with NIBIN, right? I've seen a bunch of these others. He didn't say that part, but that's sort of implicit in what he's saying. And, you know, this is a NIBIN report, right? That's all I know about it, but I can tell you that this is a NIBIN report. Why isn't that enough for authentication? If I could start with one thing. He didn't actually say that, Your Honor. What he said is- It's totally fair. Except, hypothetically, imagine he did say that.  I just want to clarify. No, you're totally right. Now. It doesn't even tell you, though, where the document came from, whether it's a fabrication or not. He looks at it, and he says it looks like it. Unless he can say it came from the state or it came from someplace, it's not authenticated. And Judge Diamond's gotten to where I was going, Your Honor, which Judge Anderson said as well, which is you can't say that this document has any reliability. The producing entity, the federal government, didn't generate this. Assuming it's real, the government didn't generate it. They can't speak to the character of how reliable the process is. The government can't even speak to it. If the government had been seeking to admit this evidence, they would have needed a custodian or a certification. And the court specifically said its obligation is to imply the evidentiary rules even-handedly to both sides, and specifically said to the defense, you wouldn't want me doing this if it were the reverse. You wouldn't agree that the government could get this in just automatically by naming what it is and putting it in. And that was the concerns that the district court had, is that there's no, you know, should an Ivan report in and of itself have reliability? Possibly, but not when there isn't a context for that. There was no context found here under this circumstance. And the government had a right to hold the defendant to his burden of meeting the evidentiary standards, and it made that objection on that behalf. It's important to remember, this exhibit was only utilized one time. It was only utilized to ask a question that was interrupted. So we do not know what specific substantive question was coming to Officer Schmidt that that objection was upheld. It was overruled in every other context. The government, to the extent that Officer Agent Brown was asked a question, he was allowed to answer the only question that Mr. Warren had for him. And could Officer, in your view, could Officer Schmidt have been asked the question, were you aware that there was another suspect who had this firearm 10 months later? I don't think he could have been asked that question necessarily. Why not? I think he could have been asked, were you aware that the firearm, because the Nyburn report doesn't support that question, that statement, Your Honor. What he can ask him is, provides a good faith basis for it, doesn't it? Not necessarily, Your Honor, because Mr. Breland was still out on release at that time. So it could have been Mr. Breland figuratively. I mean, again, talking in hypothetical contexts. So could you have asked, were you aware that the weapon had been seized? Absolutely. You could have asked that question. He chose not to. Speaking to the thoroughness of the investigation, the theory for what this report was intended for, he did ask Agent Fortner or Officer Fortner about whether any fingerprint analysis had been done, whether there'd been any saliva tests done, whether there'd been any blood sample testing done, whether there'd been any gunshot residue testing done, whether there'd been any search warrants made for the car or the home or the jacket related to Mr. Breland. And all of those questions drew answers of no. So the thoroughness of the investigation was more than amply examined. Holding out this one piece of evidence, even if this court should get to a point of viewing it as an error, was clearly harmless error in the weight of the evidence. Two videos that show this defendant following this victim through the door, back again, through the door again, and shooting him nine times on the ground. The court properly held it out, and if by any slim chance it made a mistake, it would have been a harmless error. Is there anything else I could answer for the court? Thank you. Thank you very much. Mr. Warren. A few quick points. Judge Richardson, on your question of can that question be asked, in this, I don't have a page citation, but the government makes this argument really in response to the new trial motion that lawyers can't ask a question where the answer's going to be no. A defense lawyer, do you know about this? And the answer is no. That doesn't make it an impermissible question. It may not help on authentication. What you can't do is suggest an answer in your cross-examination where you know the suggestion is not supported. Of course. Of course. That's the standard. Yeah, I mean, if you knew that he didn't know the fact, I mean, I assume since you were asking him if he had seen the report, you didn't know whether he had seen the report, right? Like, have you seen this report? No. I assume when you asked that question, you didn't know the answer to it, right? And so I assume you didn't know what information he had about this Lexington County report. None of this, like, makes a whole lot of a difference here. But the point is, you could have explored the idea of a lack of a thorough investigation without introducing the document. I agree. And I think the question I asked, I don't know if I can look, but did he know anything at all about the gun being seized from Lexington County? So I agree. I mean, there was certainly, we did that at trial. Actually, you probably could have asked directly, did you get an IBIN report? Did you request an IBIN report? I agree that that question could have been asked. And that was the initial point I wanted to make, was that we can ask questions like that, as long as we have a good faith basis. In terms of the IBIN report only being used once in relation to Investigator Smith, I just want to be very precise. The purpose of the offer of proof, and I think it says it in the introductory paragraph to the offer of proof, was to offer that document, which was among the Lexington County documents, for cross-examination of Investigator Fortner and any other City of Columbia officers that testified. Judge Anderson, I think, was well aware that we were trying to use that document throughout, and that's why we submitted the written offer of proof. In terms of the waiver argument, I think the government just gets the waiver argument wrong. And I point first to a couple of pages in the joint appendix that I think help clarify this. The offer of proof is filed the morning of the second day of trials, still in the government's case in chief. And the government has cabined their waiver argument only to relate to the 902 arguments related to the Lexington County documents, which was in the offer of proof. That offer of proof is filed as a court's exhibit the morning of the second day of trial. On page 287 to 289, there's the first discussion about the offer of proof. Then on 302 to 307, Judge Anderson addresses the self-authentication arguments. And then later, 335, Judge Anderson notes that he previously sustained the government's objection to the offer of proof. It was marked as a court's exhibit, with the exception of Judge Anderson's remark on page 335, which harkens back to what he did previously. All of that occurred prior to Investigator Fortner testifying. Regardless of whether or not the documents were self-authenticating under Rule 902.5, the error that we have argued in the brief is the exclusion of those documents in the government's case in chief in relation to cross-examination. The fact that Mr. Breland did not introduce those documents in a case in chief. How do you cross-examine a witness with a document that's not admissible? It's fundamental that a document has to be authenticated. In court, you have to know that that is the document and it's not a fabrication or something else. And so somebody has to authenticate it. Now that's not a high bar, but still it has to be done. I mean, and the fact that it's in the government file doesn't mean a thing. I mean, it could be government picks up phony passports and picks up phony IDs and picks up notes that are all kinds of documents that can't be put into evidence, at least for the truth of no matter. In Judge Niemeyer, the reason that I was going through those JA pages was solely related to the waiver argument, the waiver argument as to our self-authentication. What did you waive when you withdrew the order of proof? The order, the offer of proof was withdrawn after the close of the government's case. And that withdrawal was Mr. Breland withdrawing his effort to introduce that in his case in chief, which we ultimately ended up not putting up. The arguments related to 9025 happened in the government's case in chief. Prior to Investigator Fortner's testimony, Judge Anderson ruled that the document was not self-authenticating before Investigator Fortner's testimony. What happened in the defendant's case in chief, whether we introduced evidence, has no bearing on that error which occurred in the government's case in chief. All right. Unless there are any further questions, we'll rest on the remaining issues. Thank you. Mr. Warren, I observed you were court appointed. Is that right? Yes, Your Honor. I want to share the same view. That really is an important function of our court, and I really appreciate your service to the court. Thank you, Judge. Thank you very much. We'll come down and, do you want a break? No, I'm good. Do you need a break? I'm good. Okay. We'll come down and greet counsel and proceed on to the last case.
judges: Paul V. Niemeyer, Julius N. Richardson, Henry F. Floyd